**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| M. Scott Metsker, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:15-cv-00286-FJG |
| | ) | |
| v. | ) | |
| | ) | |
| Daniel R. Cahoon, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO DEFENDANTS DANIEL AND NICOLE CAHOON' MOTION FOR SUMMARY JUDGMENT

COME NOW Plaintiffs' M. Scott Metsker and Victoria R. Metsker (hereafter referred to as "Plaintiffs" or "Metskers"), and for their response to the Motion for Summary Judgment (hereafter referred to as "Motion") of Defendants Daniel and Nicole Cahoon (hereafter referred to as "Daniel" or "Nicole", or collectively as "Cahoons"), state to the Court as follows:

### I. Plaintiffs' Response to Cahoons' Statement of Uncontroverted Material Facts

1. Plaintiffs admit the allegations set forth in Fact Number 1.

2. Plaintiffs admit that Daniel has testified that he was an employee of H & R Block, but otherwise are without sufficient information or knowledge to admit or deny Fact Number 2.

3. Plaintiffs admit that Graebel Relocation Services Worldwide, Inc. (hereafter referred to as "Graebel") was involved in the sale of the house that is the subject of this litigation, but otherwise are without sufficient information to admit or deny the allegations set forth in Fact Number 3.

4. Plaintiffs admit the allegations set forth in Fact Number 4.

5. Plaintiffs admit the allegations set forth in Fact Number 5.

6. Plaintiffs admit that Daniel testified that he was the one who completed the Disclosure, but it was signed by both Daniel and Nicole. Plaintiffs are otherwise without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 6.

7. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 7 but are otherwise without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 7.

8. Plaintiffs admit that Daniel testified that he was the one who completed the Graebel Disclosure, but it was signed by both Daniel and Nicole. Plaintiffs are otherwise without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 8.

9. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 9 but are otherwise without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 9.

10. Plaintiffs admit the allegations set forth in Fact Number 10. In further response to Fact Number 10, it is uncontroverted that both disclosures were supplied to Plaintiffs and made a part of the subject contract.

11. Plaintiffs admit the allegations set forth in Fact Number 11.

12. Plaintiffs admit the allegations set forth in Fact Number 12, but further state that they had never had any contact with Cahoons and therefore never had an opportunity to ask them any questions.

13. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 13, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 13.

14. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 14, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 14.

15. Plaintiffs admit the allegations set forth in Fact Number 15.

16. Plaintiffs admit the allegations set forth in Fact Number 16.

17. Plaintiffs admit the allegations set forth in Fact Number 17.

18. Plaintiffs admit the allegations set forth in Fact Number 18.

19. Plaintiffs admit the allegations set forth in Fact Number 19.

20. Plaintiffs admit the allegations set forth in Fact Number 20.

21. Plaintiffs admit the allegations set forth in Fact Number 21.

22. Plaintiffs admit the allegations set forth in Fact Number 22.

23. Plaintiffs admit the allegations set forth in Fact Number 23.

24. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 24, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 24.

25. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 25, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 25.

26. Plaintiffs admit the allegations set forth in Fact Number 26.

27. Plaintiffs admit the allegations set forth in Fact Number 27.

28. Plaintiffs admit the allegations set forth in Fact Number 28.

29. Plaintiffs admit the allegations set forth in Fact Number 29.

30. Plaintiffs admit the allegations set forth in Fact Number 30.

31. Plaintiffs admit the allegations set forth in Fact Number 31.

32. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 32, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 32.

33. Plaintiffs admit that the fire report reflects that the fire itself was contained to the room of origin and that it contains a great deal of other information not set forth in Fact Number 33.

34. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 34, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 34.

35. Plaintiffs admit that Daniel and Mike Pottinger testified consistent with the facts set forth in Fact Number 35, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 35.

36. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 36, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 36.

37. In regard to the facts set forth in Fact number 37, Plaintiffs admit that Defendants disclosed a "small contained fire" in their disclosures but failed to disclose the magnitude and significance of the damage caused when the fire occurred.

38. Plaintiffs admit the allegations set forth in Fact Number 38.

4

39. In regard to the facts set forth in Fact Number 39, Plaintiffs admit that the disclosure set forth that there had been an insurance claim and that Nicole testified consistent with that fact, however, Cahoons failed to disclose the magnitude and significance of said insurance claim.

40. Plaintiffs admit the allegations set forth in Fact Number 40.

41. Plaintiffs admit the allegations set forth in Fact Number 41, but further state that the Graebel Disclosure failed to disclose the magnitude and significance of the fire and/or the damage that was caused to the house as a result of the occurrence of the fire.

42. Plaintiffs admit the allegations set forth in Fact Number 42, but further state that the Graebel Disclosure failed to disclose the magnitude and significance of the fire and/or the damage that was caused to the house as a result of the occurrence of the fire.

43. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 43.

44. In regard to the facts set forth in Fact Number 44, Plaintiffs admit that neither Plaintiffs nor their agent directly asked Cahoons for more information regarding the fire because none of them ever had any contact with Cahoons; however, as will be described further herein, Plaintiffs' real estate agent, Cathy Counti, specifically asked the agent whom Cahoons had selected to sell the house, Chris Hall, for additional information.

45. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 45, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 45.

46. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 46, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 46; in further response, Plaintiffs state that what

5

Cahoons did or did not disclose to other individuals not parties to this litigation is irrelevant and immaterial to any issue in the cause herein.

47. Plaintiffs admit the facts set forth in Fact number 47. In further response, Plaintiffs state that their realtor made inquiries of the Cahoons realtor as will be further discussed herein.

48. Plaintiffs admit the allegations set forth in Fact Number 48.

49. In regard to the facts set forth in Fact Number 49, Plaintiffs admit that the disclosure set forth that there had been an insurance claim, however, Cahoons failed to disclose the magnitude and significance of said insurance claim.

50. Plaintiffs admit the allegations set forth in Fact Number 50.

51. Plaintiffs admit the allegations set forth in Fact Number 51.

52. Plaintiffs admit the allegations set forth in Fact Number 52.

53. Plaintiffs admit that Mike Pottinger testified consistent with the facts set forth in Fact Number 53, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 53.

54. Plaintiffs admit that Mike Pottinger testified consistent with the facts set forth in Fact Number 54, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 54.

55. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 5, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 55.

56. Plaintiffs admit that Daniel's affidavit is consistent with the facts set forth in Fact Number 56, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 56.

57. Plaintiffs admit that Daniel's affidavit is consistent with the facts set forth in Fact Number 57, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 57.

58. Plaintiffs admit the allegations set forth in Fact Number 58.

59. Plaintiffs admit the allegations set forth in Fact Number 59, but further state that they were not apprised nor were they aware of the magnitude of the water penetration issues with the house.

60. Plaintiffs admit the allegations set forth in Fact Number 60.

61. Plaintiffs admit the allegations set forth in Fact Number 61.

62. Plaintiffs admit that the Graebel Disclosure does not reflect that there were any issues with water intrusion and that Daniel testified consistent with the facts set forth in Fact Number 62; Plaintiffs are otherwise without sufficient information or knowledge to admit or deny the facts set forth in Fact Number 62.

63. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 63, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 63.

64. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 64, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 64.

65. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 65, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 65.

66. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 66, but deny that whatever actions Daniel had taken failed to alleviate the water issues Plaintiffs deal with every time there is a significant rain.

67. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 67, but otherwise deny the allegations set forth in Fact Number 67 based on their experience with water intrusion in the house since they purchased it, the evidence of previous water damage, and the testimony of Frank Comer

68. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 68, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 68.

69. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 69, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 69.

70. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 70, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 70.

71. Plaintiffs admit that Scott made the statement set forth in Fact Number 71 but further stated he was not aware of where the water was coming from because he never actually observed it.[1]

72. In regard to the facts set forth in Fact Number 72, Plaintiffs deny that the concrete slab outside the basement sliding door was not present when they purchased the house. They admit that they had additional concrete installed in the areas beyond the existing concrete slab.

---

[1] Scott Metsker Deposition, P. 282, L. 12-21.

73. Plaintiffs admit the allegations set forth in Fact Number 73.

74. Plaintiffs admit the allegations set forth in Fact Number 74.

75. Plaintiffs admit that Daniel and Nicole testified consistent with the facts set forth in Fact Number 75, but are otherwise without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 75.

76. Plaintiffs admit the allegations set forth in Fact Number 76.

77. Plaintiffs admit the allegations set forth in Fact Number 77.

78. Plaintiffs admit the allegations set forth in Fact Number 78.

79. Plaintiffs admit the allegations set forth in Fact Number 78.

80. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 80, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 80.

81. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 81, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 81.

82. Plaintiffs admit the allegations set forth in Fact Number 82.

83. Plaintiffs admit the allegations set forth in Fact Number 83.

84. Plaintiffs admit the allegations set forth in Fact Number 84.

85. Plaintiffs admit the allegations set forth in Fact Number 85.

86. Plaintiffs admit the allegations set forth in Fact Number 86.

87. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 87, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 87.

88. Plaintiffs admit that Mike Pottinger testified consistent with the facts set forth in Fact Number 88, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 88.

89. Plaintiffs admit the allegations set forth in Fact Number 89.

90. Plaintiffs admit the allegations set forth in Fact Number 90.

91. Plaintiffs admit the allegations set forth in Fact Number 91.

92. Plaintiffs admit the allegations set forth in Fact Number 92.

93. Plaintiffs admit the allegations set forth in Fact Number 93.

94. Plaintiffs admit that Daniel testified consistent with the facts set forth in Fact Number 94, but otherwise are without sufficient information or knowledge to admit or deny the allegations set forth in Fact Number 94.

95. Plaintiffs admit the allegations set forth in Fact Number 95.

96. Plaintiffs admit the allegations set forth in Fact Number 96.

97. Plaintiffs admit the allegations set forth in Fact Number 97.

## Index of Exhibits

| Exhibit | Description |
| --- | --- |
| A | Exhibit A-Seller's Disclosure and Condition of Property Addendum on Better Homes and Gardens form |
| B | Exhibit B-Graebel Homeowner Disclosure Statement |
| C | Exhibit C-Residential Real Estate Sale Contract (Original Offer from Metskers to Cahoons |
| D | Exhibit D-Counter Offer Addendum from Cahoons to Metskers |
| E | Exhibit Z-Final Residential Real Estate Contract between Graebel and Metskers |
| F | Exhibit P-Broker Market Analysis submitted by Christine Hall to Cheri Woodard of Graebel |

10

| G | Deposition Testimony of Cheri Woodard |
|---|---|
| H | Exhibit H-Email from Graebel to Christine Hall |
| I | Deposition Testimony of Christine Hall |
| J | Deposition Testimony of Cathy Counti |
| K | Deposition Testimony of Daniel Cahoon |
| L | Deposition Testimony of Mike Pottinger |
| M | Exhibit 11-Email from another agent to Christine Hall |
| N | Exhibit 40-Scope of work and estimate of repairs prepared by Cahoons' insurance carrier to repair damage from fire |
| O | Exhibit 58-Request for additional funds prepared by Mike Pottinger and submitted to Cahoons' insurance carrier |
| P | Deposition of Scott Metsker |
| Q | Deposition Testimony of Frank Comer |
| R | Exhibit 24-Report of Frank Comer |

## II.  Plaintiffs' Statement of Additional Material Facts

1. Metskers initially signed a certain Residential Real Estate Sale Contract that had the names of Daniel and Nichole [sic] as the Sellers which provided that the Sellers Disclosures and Condition of Property Add. were part of the contract.[2]

2. Daniel and Nichole Cahoon executed a Counter Offer Addendum which reflected the final purchase price of $408,000.[3]

3. Metskers were provided Seller's Disclosure and Condition of Property Addendum that indicated "small electrical fire in exterior wall contained w/no structural damage."[4]

---

[2] Exhibit C, Paragraph 3.
[3] Exhibit D.

11

4.  Metskers were provided another Disclosure Statement on Graebel's form which indicated "Small electrical fire in 2008. No structural damage. Smoke and water."[5]

5.  This same disclosure indicates in another section that there was a fire and further instructs the sellers: "If any of the answers in this section are 'Yes' (except h), explain in detail" and sellers are provided four lines to further explain and Cahoons simply wrote "See Line 108."[6]

6.  Likewise, in this same section 15, Cahoons indicated that there had been an insurance or other claim pertaining to the Property, and they were instructed to provide the details of that below and there were no details other than "See Line 108."[7]

7.  Metskers were later requested to execute a new Residential Real Estate Sale Contract which showed Graebel as the Seller and also reflected that the Seller's Disclosures and Condition of Property Add. were attached and made a part of the contract.[8]

8.  Section 9 G of said Graebel disclosure form also indicates that there was fire damage and the form further provides "If yes, explain on an attached sheet, and there was no attached sheet.[9]

9.  The Cahoons marked "Yes" on the Graebel disclosure form indicating they had a homeowner's insurance claim and the form further stated "If yes, explain when and why." The only thing Cahoons noted was "Roof inspection after hail storm. No damage."[10]

---

[4] Exhibit A, Section 8.
[5] Daniel deposition, P.60, L. 13-22 and Exhibit B, Section 9 G.
[6] Exhibit A, Section 15(b) and bottom of section.
[7] Exhibit A, Section 15(q) and bottom of section.
[8] Exhibit E (Z), Paragraph 3.
[9] Exhibit B, Section 9.
[10] Exhibit B, Section 3N.

10. The Graebel disclosure form also asks: "Are there any standing water, drainage, or flooding problems on the property?" to which Cahoons indicated "No."[11]

11. On May 31, 3013, the property at 8821 Boten, Lee's Summit, Missouri ("Property") was deeded from Daniel Cahoon and Victoria Cahoon to the GRSW Stewart Real Estate Trust.[12]

12. Section 9 G of said Graebel disclosure form also indicates that there was fire damage and the form further provides "If yes, explain on an attached sheet." There was no attached sheet and there was otherwise no further explanation provided.[13]

13. As part of the process of engaging a real estate agent, prospective agents are required to complete a "Broker's Market Analysis and Strategy Report" ("BMA"). Christine Hall, the agent ultimately hired by Graebel, completed one and submitted it to Cheri Woodard ("Woodard"), the relocation specialist for Graebel handling the transaction. Hall indicates on the BMA as follows:

    "THE HOUSE HAD AN ELECTRIAL [sic] FIRE SEVERAL YEARS BACK, IN AN OUTSIDE WALL. IT WAS QUICKLY CONTAINED SO THERE WAS NO STRUCUAL [sic] DAMAGE. THERE WAS EXTENSIVE SMOKE DAMAGE WHICH IS WHY THE WHOLE HOUSE WAS TORN OUT AND REBUILT."[14]

14. The BMA also asks the agent "What are the three-five challenges to getting this property sold?" Hall indicates in relevant part: "4. DISCLOSING PREVIOUS FIRE"[15]

**Testimony of Cheri Woodard-Graebel Relocation Specialist**

15. Cheri Woodard "Woodard"), the relocation agent in charge of the sale of Property, received a copy of the Cahoons' seller's disclosures, and had an opportunity to review it.

---

[11] Exhibit B, Section 9B.
[12] Woodard deposition, P. 27, L. 6-23.
[13] Exhibit B, Section 9.
[14] Exhibit F (P), 1st Page.
[15] Exhibit F (P), 6th Page.

She noted from section 8 that the Cahoons were representing that Property had a "small electrical fire."[16]

16. Woodard described Chris Hall, the agent with Better Homes and Gardens Graebel had retained to sell Property, as "our eyes to the house."[17]

17. Neither Woodard nor Hall requested any documentation regarding the work that had been done due to the fire.[18]

18. Woodard never asked Hall what the cost of the repairs were as a result of the fire nor did she ask Hall to ask the Cahoons what the cost of the repairs were.[19]

19. Graebel requires the transferee (in this case, the Cahoons) to complete a disclosure on Graebel's form and that both disclosures become a part of the contract package.[20]

20. It is Woodard's understanding that both disclosure forms were provided by Hall to the Metskers' real estate agent, who then would have provided them to Metskers.[21]

21. Woodard was not aware that there was a fire report from the fire department or that the fire department was even involved in putting out the subject fire.[22]

22. Woodard admits having read the Broker Market Analysis prepared by Graebel's agent, Chris Hall, and recalled reading the following language contained in said document:

"The house had an electrical fire several years back, in an outside wall. It was quickly contained so there was no structural damage. There was extensive smoke damage which is why the whole house was torn out and rebuilt."[23]

23. Woodard showed the Broker Market Analysis to her manager, Greg Holland, and in regard to the above statement, he told Woodard, "Disclose."[24]

---

[16] Woodard deposition, P. 28, L. 5-P. 29, L. 14 and Exhibit A.
[17] Woodard deposition, P. 29, L. 19-21.
[18] Woodard deposition, P. 30, L. 3-6 and P. 39, L. 12-17.
[19] Woodard deposition, P. 30, L. 21- P. 31, L. 1.
[20] Woodard deposition, P. 33, L. 8-P. 34, L. 3 and Exhibit B and Exhibit E(Z).
[21] Woodard deposition, P. 34, L. 16-P. 35, L. 1. And P. 35, L. 6-8.
[22] Woodard deposition, P. 50, L. 17-P. 51, L. 1.
[23] Woodard deposition, P. 52, L. 2-24.

24. Woodard acknowledges that there was nothing in either of the disclosure forms that indicates that the whole house was torn out and rebuilt.[25]

25. When asked whether she believed Graebel had an obligation to disclose adverse information it had regarding the property to the buyers, she responded, "We don't disclose."[26]

**<u>Testimony of Christine Hall-Real Estate Agent for Graebel</u>**

26. Christine Hall (hereafter referred to as "Hall"), of Better Homes and Gardens real estate firm, was the agent for Graebel and was required to sign paperwork making it clear that she was working for Graebel after a telephone interview with Woodard.[27]

27. Hall was to have no direct contact with the Metskers and all communication was to be through their agent, Cathy Counti (hereafter referred to as "Counti").[28]

28. If Hall were aware of a material defect, she "absolutely would have to make sure they [sellers] put it on the seller's disclosure.[29]

29. According to Hall, fire is one of two of the most inflammatory words and she describes fire as "Defcon 5", so she clearly understood how serious a past fire is in regard to the sale of a house.[30]

30. Graebel's real estate agent acknowledges the ramifications of trying to sell a house that has had a fire and that "there's always going to be a stigma to a house with a fire."[31]

---

[24] Woodard deposition, P.55, L. 8-17.
[25] Woodard deposition, P. 55, L. 20-25.
[26] Woodard deposition, P. 88, L. 16-21.
[27] Hall deposition, P. 16, L.18-P. 17, L. 6.
[28] Hall deposition, P. 31, L18-P. 32, L. 6.
[29] Hall deposition, P. 35, P. 15-22.
[30] Hall deposition, P. 42, L. 12-20.
[31] Hall deposition, P. 44, L. 7-13 and P. 136, L. 14 and P. 137, L. 5-8.

31. Hall testifies that the disclosure did not require further explanation because, "I don't care as a buyer's agent because I am not necessarily going to believe anything the seller tells me anyway."[32]

32. Hall testifies that she was to "fiduciarily protect them [Graebel]" and claims that it would not be appropriate to share the BMA (Broker Market Analysis) with anyone other than Graebel. [33]

33. Hall identified an email from a real estate agent who had walked through the house and could tell there had been water damage in the basement and wondered why the sellers had not torn out the basement.[34]

34. Graebel's real estate agent never asked the Cahoons how much it cost to restore the house as a result of the 2008 fire.[35]

35. According to Hall, it is between Graebel and the Cahoons whether or not a sheet is attached to their disclosure further explaining why the box indicating fire was checked.[36]

36. Hall testified that it is the law that every material defect be disclosed.[37]

37. Hall testified that, "If I think they've overdisclosed or underdisclosed or if they're incorrect, I can tell them that in my opinion, that does not seem to really cover the details the way it should."[38]

38. Hall further testified that if she believes the information provided in the disclosure is inaccurate or deceptive, she has a duty to have a discussion with the homeowners about it.[39]

---

[32] Hall deposition, P. 45, L. 13-19.
[33] Hall deposition, P. 50, L. 17-P. 51, L. 1.
[34] Hall deposition, P. 69, L. 19-21, P. 71, L. 17-22 and Exhibit M (11).
[35] Hall deposition, P. 178, L. 16-25.
[36] Hall deposition, P. 192, L. 24- P. 193, L. 19.
[37] Hall deposition, P. 195, L. 8-11.
[38] Hall deposition, P. 196, L. 6-10.

16

39. Hall believes that, if Graebel was aware of a material defect with the property, they had a duty to disclose it to the buyers.[40]

40. Hall acknowledges that she was aware of the fact that the house sustained extensive smoke damage which is why the house had to be torn out and rebuilt. [41]

41. Hall has no memory of the Daniel Cahoon telling her there had been a single issue of water intrusion from the outside, because if he had, she would have insisted that he put it on the disclosure, and she acknowledged it was not on the disclosure.[42]

42. Hall testifies that she cannot imagine that she did not have discussions with Woodard about the fire given the information contained in the BMA.[43]

### Testimony of Cathy Counti-Real Estate Agent of Metskers

43. The Metskers' real estate agent, Counti, believes Graebel knew that the fire was not a small electrical fire confined to a bedroom and knew it was much more extensive than was disclosed.[44]

44. According to Counti, she was told by Hall that there was a small fire in a bedroom and that the Cahoons loved the house so much they decided to upgrade other areas of the house.[45]

45. Counti testifies that the buyer of property has a right to know the history of the property so they can decide whether or not to purchase it; she emphasizes that the Metskers will

---

[39] Hall deposition, P. 196, L. 21-25.
[40] Hall deposition, P. 207, L. 1-15.
[41] Hall deposition, P. 211, L. 17-22.
[42] Hall deposition, P. 226, L. 22-P. 227, L. 9.
[43] Hall deposition, P. 231, L. 12P. 232, L. 3.
[44] Counti deposition, P. 14, L. 8-21. See also See also P. 174, P. 174, L. 15-20.
[45] Counti deposition, P. 16, L. 1-12. See also P. 21, L. 23-P. 22, L. 22.

have to fully disclose the history is much more significant than they were told or they could be sued.[46]

46. Counti testifies that she did not ask for a scope of work because Hall presented that the fire was small and not a big deal.[47]

47. Counti insists that Hall violated her ethical obligation because of the information she conveyed regarding the fire.[48]

48. Counti testifies that Hall has an ethical obligation to give true material facts about the property, and "she gave minimized material facts about the property."[49]

49. Counti believes that the scope of work and permits should have been attached to the disclosure.[50]

50. Counti was told by Hall that the fire was small and "it was put out quickly' which is the information she transmitted to the Metskers.[51]

51. When Counti first saw the BMA (Broker Market Analysis), she "gasped" because she then knew at that time that both Hall and Graebel knew about the magnitude of the fire and "chose to either not tell us or to minimize it."[52]

52. Counti testifies that the seller disclosed a number of things but chose to hold back one item that it did know.[53]

---

[46] Counti deposition, P. 22, L. 12-P. 23, L. 2.
[47] Counti deposition, P. 25, L.24-P. 26, L. 5.
[48] Counti deposition, P. 26, L. 16-19. See also P. 92, L. 2-14.
[49] Counti deposition, P. 29, L. 5-7.
[50] Counti deposition, P. 43, L. 5-10.
[51] Counti deposition, P. 46, L 19-P. 47, L. 8.
[52] Counti deposition, P. 54, L. 18-P. 55, L. 1. See also P. 56, L. 10-14. See also P. 90, L. 21-P. 91, L. 15.
[53] Counti deposition, P. 60, L. 19-23.

53. Counti testifies that Graebel gave the disclosure form to Cahoons to complete and that the relocation counselor (Woodard) saw evidence that the fire was minimized and did not pass through to the buyers what she knew.[54]

54. Counti's opinion is that Graebel, Cahoons and Hall all knew about the fire and purposely did not disclose the "whole and true material fact."[55]

55. Counti is relying on the disclosures to be true and on the agent to verify from her knowledge that the information is true.[56]

56. Counti draws a distinction between the terms restoration and renovation in that renovation means a house is livable but someone wants to make it prettier, better, newer, and restoration means it is broken or damaged and not livable and the property needs to be restored to a livable condition.[57]

57. During all of the conversations Counti has with Hall, Hall did not use the words restore or restoration, and that everything was referred to as upgrades.[58]

**<u>Testimony of Daniel Cahoon</u>**

58. Cahoons purchased Property for a price of $300,000 or $305,000.[59]

59. Fire occurred at Property in November of 2008.[60]

60. Daniel believed his total insurance claim as a result of the fire was around $250,000.[61]

61. Cahoons had to relocate to a house at Lake Lotawana while the fire restoration was being completed by Pottinger.[62]

---

[54] Counti deposition, P. 61, L. 13-25.
[55] Counti deposition, P. 68, L. 1-P. 69, L. 9.
[56] Counti deposition, P. 163, L. 17-22.
[57] Counti deposition, P. 204, L. 21-P. 206, L. 5.
[58] Counti deposition, P. 206, L. 11-16. See also, P. 207, L. 12-20.
[59] Cahoon deposition, P. 15, L. 8-10.
[60] Cahoon deposition, P. 19. L. 3-4.
[61] Cahoon deposition, P. 20, L. 18-25.
[62] Cahoon deposition, P. 24, L. 10-15.

62. Cahoons had to relocate for a total of ten months during the restoration.[63]

63. Daniel acknowledges that a prospective buyer would review the disclosure and to some extent rely on the information contained in it.[64]

64. Daniel supplied a copy of the disclosure to Graebel and nobody from that firm ever asked any questions about the fire, requested any documentation regarding the fire, or asked for any information regarding the fire claim.[65]

65. Daniel understood that the Graebel disclosure that was emailed to him by Woodard had to be completed and that it would be provided to any prospective buyers and that they would take into consideration the information provided therein in regard to their decision as to whether or not to purchase the house.[66]

66. It was Daniel's belief that both of the disclosure forms would be provided to prospective buyers.[67]

67. Daniel told Hall all about the fire including their needing to redo everything.[68]

68. Daniel testified that they had experienced water intrusion a half a dozen times and water would pool outside of the basement door.[69]

69. Daniel testified that they experienced water intrusion problems less than ten times.[70]

70. Daniel describes in his deposition an incident of water intrusion they had in May of 2013, the month before the Metskers signed the contract to purchase Property.[71]

---

[63] Cahoon deposition, P. 24, L. 25-P. 25, L. 6.
[64] Cahoon deposition, P. 36, L. 11-20.
[65] Cahoon deposition, P. 40, L. 12-25.
[66] Cahoon deposition, P. 60, L. 13- P. 61, L. 18.
[67] Cahoon deposition, P. 62, L. 24-P. 63, L. 3.
[68] Cahoon deposition, P. 128, L. 9-20.
[69] Cahoon deposition, P. 48, L. 13-P. 49, L.1 and P. 51, L. 18-P. 52, L. 1 and P. 52, L. 13-18.
[70] Cahoon deposition, P. 94, L. 19-22.
[71] Cahoon deposition, P. 54, L. 25-P. 55, L. 14.

20

71. Paragraph 4(d) of the Better Homes disclosure indicates "No" in regard to any drainage or flood problems on the Property or adjacent properties.[72]

72. Paragraph 7(d) of the Better Homes disclosure indicates "No" in regard to water leakage or dampness in the house, crawl space or basement.[73]

### Testimony of Mike Pottinger-Contractor Who
### Completed Fire Restoration for Cahoons

73. Mike Pottinger (Hereafter referred to as "Pottinger") is the contractor the Cahoons hired following the 2008 fire. He identifies the scope of work and estimate prepared by Cahoons' insurance company to repair the damage that resulted from the 2008 fire reflecting a cost to repair the damage of $208,339.13[74]

74. Pottinger had to replace some charred studs.[75]

75. According to Pottinger, everything permeable had to be removed from the house including carpeting, sheetrock, wood, doors, door frames, cabinetry, and insulation; and then he had to place Kilz on everything to encapsulate the smell and then put the house back together, in order to make it habitable.[76]

76. Pottinger had to tear out and replace an acoustic ceiling.[77]

77. Pottinger testified that all of the drywall on the first and second floors had to be replaced and was replaced by his company.[78]

78. The insurance company paid for, and Pottinger replaced four exterior doors.[79]

---

[72] Exhibit A, P. 1.
[73] Exhibit A, P. 2.
[74] Pottinger deposition, P. 26, L. 7-18 and Exhibit N (40).
[75] Pottinger deposition, P. 28, L 12-13.
[76] Pottinger deposition, P. 29, L. 12-19.
[77] Pottinger deposition, P. 30, L. 17-24.
[78] Pottinger deposition, P. 44, L. 9-P. 45, L. 2.
[79] Pottinger deposition, P. 62, L. 9-15.

21

79. Pottinger attempted to get another $16,693.52 from the insurance company for additional work required due to the fire but does not recall how much more his company was paid.[80]

80. According to Pottinger, when he walked through the house after the fire, "you just got knocked over by the smell of smoke." "And then we gutted the house down to the studs so what's left is the exterior siding of the house and the studs."[81]

**Testimony of Scott Metsker**

81. Scott Metsker ("Scott") first noticed water intrusion problems a few days after they moved in; there was approximately a six foot wet area by the basement door.[82]

82. Scott next noticed water in the basement the following week.[83]

83. Scott noticed water in the basement again the following week.[84]

84. Scott attempted to determine the source of the water at that time but was not successful.[85]

85. Scott next noticed water around the middle of September (2013) when he noticed that the bottoms of boxes and the carpet were wet.[86]

86. Scott next saw water in the basement in early November.[87]

87. Scott has found mold in various areas throughout the lower level; he believes it existed at the time they moved in and he just did not notice it.[88]

88. Scott has removed drywall and trim from Property that he believed contained mold.[89]

89. The damages as a result of the fire were far beyond what they knew when they purchased Property.[90]

---

[80] Pottinger deposition, P. 97, L. 3-22 and Exhibit O (58).
[81] Pottinger deposition, P. 109, L. 19-P. 110, L. 2. See also P. 117, L. 7-14.
[82] Metsker deposition, P. 41, L. 23-P. 42, L. 14.
[83] Metsker deposition, P. 43, L. 2-19.
[84] Metsker deposition, P. 44, L. 2-10.
[85] Metsker deposition, P. 46, L. 5-9.
[86] Metsker deposition, P. 46, L. 13-24.
[87] Metsker deposition, P. 51, L. 6-8.
[88] Metsker deposition, P. 80, L 15-P. 81, L. 19.
[89] Metsker deposition, P. 80, L. 15-P. 81, L. 19.

22

90. Scott did not do any further investigation into the fire prior to their purchase because it was presented as a "small fire" so he believed it was equivalent to a fire in a waste can, or a grease fire or a fire limited to one electrical outlet.[91]

### Testimony of Frank Comer, P.E.

91. Frank Comer ("Comer") was hired by the Metskers and prepared a report based on two inspections of Property, and was prepare approximately two months after the second inspection.[92]

92. Comer believes that the holes in the joists due to their size and spacing present a structural hazard at Property.[93]

93. Comer detected many deflection and failure-related cracks in the joists that indicates a failure in the lumber.[94]

94. Comer is a professional engineer which he acquired by college, internship and experience.[95]

95. Comer was provided both the U.S. Inspection report provided by Graebel and the Crown inspection report which Metskers had procured.[96]

96. Comer testified that he advised the Metskers that there were excessive levels of mold spores.[97]

97. Comer does not believe the concrete slabs around the home are causing the water problems they are experiencing; in fact, he believes that the" concrete slabs are providing a ready transport of the water away from the house."[98]

---

[90] Metsker deposition, P. 128, L. 2-6.
[91] Metsker deposition, P. 147, L. 10-23.
[92] Comer deposition, P. 15, L. 5-21 and Exhibit R (24).
[93] Comer deposition, P. 42, L. 25-P. 43, L. 13 and Exhibit R (24).
[94] Comer deposition, P. 43, L. 16-P. 44, L. 4 and Exhibit R (24).
[95] Comer deposition, P. 45, L. 12-22.
[96] Comer deposition, P. 49, L. 21-24.
[97] Comer deposition, P. 56, L. 10-17.

23

98. Comer believes that water is coming from under the home and not laterally because of hydrostatic pressure.[99]

99. Comer's opinion is that the drainage condition, which has existed for many years, has water accumulation adjacent to and beneath the home, and that seepage into the basement area has resulted in saturation of the basement area floor coverings.[100]

### III. **Summary of Argument**

In the cause herein, Metskers have filed a Petition, two counts of which are specifically against Cahoons. Count I alleges that the Cahoons fraudulently represented the history of the house including, but not limited to, the nature and extent of the fire that occurred in November of 2008. The Cahoons represented that they had a small contained fire which characterization was further perpetuated by the real estate agent they had selected. In fact, the subject fire resulted in extensive damage to the house requires repairs costing approximately $225,000. This was on a house that, according to Daniel himself, only cost $300-$305,000 when they purchase it.

Cahoons also represented in two disclosures that they had never experienced water issues. However, Daniel Cahoon admitted in deposition that they had experienced water intrusion in the past, with the last occasion being the month before Plaintiffs signed the contract to purchase the property. It is no defense to failing to disclose this information that Cahoon subjectively perceived that the problem had been resolved. There is substantial evidence that there were long standing issues with water intrusion well before the Plaintiffs moved in. Within days after they moved in, they began experiencing significant problems with water in the

---

[98] Comer deposition, P. 81, L. 13-P. 82, L. 4. See also P. 83, L. 22-P. 84, L. 15.
[99] Comer deposition, P. 86, L. 2-25.
[100] Exhibit 24, p. 3b.

basement. Their expert engineer gave an opinion that Property had problems with water drainage and intrusion into the basement long before the Metskers purchased it.

Count II alleges the same misrepresentations and non-disclosures but sets forth a theory of negligent misrepresentation. Cahoons clearly had a duty to disclose any material adverse information they had about Property and they violated this duty. Cahoons claim that Metskers had an inspection done and that should somehow insulate them from liability. This is simply not the case. A reasonable inspection of all visible areas would not have revealed that the supposed "small contained fire" in fact caused $225,000 in damage. If it was not raining at the time the inspection was completed, there is no opportunity for an inspector to visualize water coming into the basement.

There is compelling evidence of Cahoons' misrepresentations which the Metskers will prove at trial. At a minimum, there are certainly genuine issues of material fact that can only be resolved by a full trial on the merits.

## IV. <u>Argument and Authorities</u>

### A. <u>Contrary to Cahoons' Contention, Metskers Have Not Released Their Claims Against Any Defendants</u>

Cahoons attempt to piggyback on the Graebel rider in a desperate attempt to relieve themselves of any liability for misrepresenting the adverse conditions they knew about Property. As Metskers have argued in their Suggestions in Opposition to the Motion for Summary Judgment filed by Graebel, the rider does not absolve Graebel of liability for consciously failing to disclose adverse information it had about Property. It certainly does not exonerate Cahoons of liability because of language contained in the rider as it pertains to Daniel Cahoon's employer, H & R Block.

Cahoons argue that, because the rider purportedly releases Graebel's principal and "its employees", this releases Cahoon from liability since he was and continues to be an employee of H & R Block. This argument might have merit (assuming the rider were effective), if Daniel Cahoon was being sued based strictly on the fact that he is an employee of H & R Block. However, this is simply not the case. He is a party to this action not because of his status with his employer, he is a defendant because he is the former owner of Property, he owned it for ten years and presumably had all information that any owner would acquire over that time, and he failed to disclose certain adverse information. He in fact not only did not disclose information, he made specific representations which were not true based on the evidence. Even if this argument had any substance, it obviously would not apply to Nicole Cahoon who has never been employed by H & R Block.

In a Missouri Southern District decision, the Court dealt with a similar set of facts where a relocation company was involved and which attempted to limit its liability.[101] In this case, the previous owners of the house had checked "no" on the disclosures in regard to flood issues, water leakage, dampness, mold, etc. The legend on the disclosure statement declared in part as follows:

> The undersigned Seller represents that the information set forth in the foregoing disclosure statement is accurate and complete. Seller does not intend this disclosure statement to be a warranty or guaranty of any kind. Seller hereby authorizes the Broker to provide this information to prospective buyers of the property and to real estate brokers and sales people.[102]

Relocation Property Management (RPM) was a relocation company involved in the sale. It attached an Addendum to the contract that declared that RPM "is a non-resident owner and has no knowledge as to the condition of this property except for any inspections/reports given to the

---

[101] *White v. Bowman,* 304 S.W.3d 141 (Mo. App. S.D. 2009).
[102] *Id.* at Page 144.

Case 4:15-cv-00286-FJG   Document 66   Filed 04/28/16   Page 26 of 33

listing agent."[103] The plaintiff, who was actually the mortgagee, brought suit against the sellers, the real estate agent and the relocation company alleging fraudulent and negligent misrepresentation. It was further alleged that the property was worth significantly less because of these representations because it actually lay in a flood zone and had suffered flooding, poor drainage, dampness, seepage, and mold. The Court set forth in its opinion the elements of negligent misrepresentation which are:

> (1) speaker supplied information in the course of his business or because of some other pecuniary interest; (2) due to speaker's failure to exercise reasonable care or competence in obtaining or communicating this information was false; (3) speaker intentionally provided the information for the guidance of a limited group of persons in a particular business transaction; (4) listener justifiably relied on the information; and (5) that as a result of listener's reliance on the statement, he/she suffered a pecuniary loss.[104]

In disagreeing with the dismissal of plaintiff's action by the trial court the Court in *White* stated that the seller's duty to speak arose from its superior knowledge prior to the execution of this contract. It ruled that the presence of a clause disclaiming warranties in a contract does not negate a pre-contractual duty to speak.

"Missouri law…holds that a party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract."[105] …[The seller's] duty to speak arose from its superior knowledge prior to the execution of this contract. The presence of a clause disclaiming warranties in a contract does not negate a pre-contractual duty to speak.[106]

In regard to the acts and omissions of the Cahoons, they were guilty of both an affirmative representation, i.e. that the house had sustained a "small contained fire", and concealment of a material fact, i.e. that the subject property had sustained extensive smoke and water damage to the point that it had to be totally gutted, Kilz applied to everything remaining in

---

[103] *Id,* at Page 144.
[104] *Id,* at Page 147 and *Harris v. Smith,* 250 S.W.3d 804, 808 (Mo. App. 2008).
[105] *Lollar v. A.O. Smith Harvestore Prods., Inc.,* 795 S.W.2d 441, 448 (Mo. App. W.D. (1990)
[106] *Artilla Cover Resort, Inv. V. Hartley,* 72 S.W.3d 291, 299 (Mo. App. S.D. 2002).

the house, and repairs made to the house totaling at least $225,000.00. Cahoons obviously knew the house had to be gutted and they knew the cost of the repairs were massive.

The *White* Court succinctly set forth the duty to disclose in situations similar to the case herein:

> Concealment of a material fact can serve as a substitute for the elements of a false representation if there exists a duty to disclose. *Reeves v. Keesler,* 921 S.W.2d 16, 21 (Mo. App. 1996. A duty to disclose exists where there is a relationship of trust and confidence between the parties or where one party has superior knowledge or information of a material fact that is not within the fair and reasonable reach of the other party.[107]

There obviously was no relationship of trust between the Cahoons and Metskers. However, the Cahoons were clearly in a position of superior knowledge. Furthermore, the knowledge of the material fact-massive damage due to the fire-was clearly not within the reasonable reach of the Metskers. Both of the disclosures blatantly minimized the nature and extent of the fire and the resulting damage. Furthermore, the assurances by Hall that it was a small fire that was quickly extinguished would have caused any reasonable person to not conduct a full scale investigation to determine if they were all lying or concealing something.

As stated above the Cahoons also failed to disclose the water issues they had experienced in the past as revealed by the deposition testimony of Daniel. Also, there is other proof that the water issues had not been resolved when they completed the above disclosures. Scott Metsker provided sworn testimony that they first experienced water intrusion in the basement within days after they moved in, and long before there was additional concrete installed in the back.

## B. Contrary to Cahoons' Contention, The Inspection Ordered by Metskers Does Not Negate Their Reliance On Defendants' Disclosures

The Better Homes disclosure form the Cahoons signed and were conveyed to Metskers contained the following language:

---

[107] *Id,* at page 149.

> 1. NOTICE TO SELLER.
> Be as complete and accurate as possible when answering the questions in this disclosure. Attach additional sheets if space is insufficient for all applicable comments. <u>SELLER understands that the law requires disclosure of any material defects, known to SELLER, in the Property to Prospective Buyer(s) and that failure to do so may result in civil liability for damages.</u> Non-occupant, SELLERS are not relieved of this obligation. This disclosure statement is designed to assist SELLER in making these disclosures. Licensee(s), prospective buyers and buyers will rely on this information.[108]

The Graebel disclosure form contains the following information:

> IN CONNECTION WITH MY/OUR RELOCATION, I/WE, MAKE THE FOLLOWING DISCLOSURES TO THE BEST OF MY/OUR CURRENT ACTUAL KNOWLEDGE REGARDING MY/OUR PROPERTY WITH THE KNOWLEDGE THAT POSPECTIVE BUYERS MAY RELY ON THIS INFORMATION IN DECIDING WHETHER, OR ON WHAT TERMS, TO PURCHASE THE PROPERTY. I/WE FURTHER UNDERSTAND THAT AN OFFER TO PURCHASE WILL NOT BE MADE UNTIL THIS DISCLOSURE IS COMPLETED.[109]

Daniel unequivocally acknowledged in his deposition that he knew that both of these disclosures would be provided to prospective buyers of Property and that they would rely on them in making their decision as to whether or not to purchase Property.[110] Now, despite the above language contained in the disclosures, and his clear understanding that a prospective buyer would rely on them, Cahoons now want to argue that, just because Metskers were prudent and had an inspection completed, they cannot be held accountable for whatever false or misleading information they placed in the disclosures, or their failure to disclose adverse information at all.

In support of their motion, Cahoons cite the case of *Brennan v. Molina*[111] which sets forth three exceptions to the proposition that a party will be deemed to not have relied on misrepresentation if he conducts their own independent investigation. Metskers fall within at least two of the three exceptions. One of the exceptions is when a party lacks equal footing for

---

[108] Paragraph 1 of Exhibit A.
[109] 1ST Page of Exhibit B.
[110] Statement of Facts 60 and 62.
[111] 934 S.W.2d 631, 635 (Mo. App. E.D. 1996)

learning the truth because there are facts peculiarly within the knowledge of the party making the representation. In the present case, Cahoons knew they had a fire which resulted in much greater damage to Property than was disclosed in both disclosures. They also by their own admission had water issues and they specifically represented that they had none. There is also substantial evidence that they had ongoing water problems that they did not admit to.

There is no realistic way even a thorough inspection could have determined the magnitude of the previous fire. The house had been gutted, Kilz was applied to what remained to mask the smell of smoke, and the Cahoons had a fire restoration completed by Pottinger. It would have been very difficult for an inspector to ascertain the water problems since it was not raining at the time of the inspection and had not rained in the days leading up to the inspection. Also, as the record reflects, copies of both disclosures were provided to the Crown Inspection and were lulled into believing the previous fire was of little consequence and that the Cahoons had not had any water issues.

Another exception set forth in the *Brennan* case is when the seller makes specific and distinct representations. As indicated above, Cahoons specifically indicated that the fire they had was a small contained fire and no other information was conveyed to Cahoons such as the fact that the house had to be gutted at a cost of approximately $225,000 to make the required repairs. Cahoons also specifically represented that they had no previous water issues, when, in reality, they had previous such issues and Metskers will prove it at trial.[112]

Cahoons argue that all of their representation are "true" and therefore they are entitled to judgment as a matter of law. There is significant evidence to support Metskers' allegations that many of the representations are in fact not true. There are, simply put, many genuine issues of material fact that can only be decided by a full trial on the merits. Cahoons will have an

---

[112] Statement of Facts 4-11.

opportunity to convince the jury that representing to Metskers that they had a small contained fire was an accurate fact and that it was not calculated to mislead prospective buyers, including Metskers, regarding the magnitude of the fire and resulting damage. They will have an opportunity to prove that not disclosing their previous water issues is totally acceptable. A jury should be allowed to determine whether any of the other statements by Cahoons were false or misleading.

The fact that a buyer conducts an independent investigation does not preclude hi/her claim of reliance on a seller's misrepresentation if the parties do not stand on "equal footing" and "the facts are peculiarly within the knowledge of the party making the representation and are difficult for the representee to ascertain." [113] "The hearer is entitled to rely on specific representations even if the parties have equal means of knowledge or the hearer conducts his own investigation but nevertheless does not stand on equal footing with the speaker and relies on the speaker's representations."[114] In the *Fox* case, the sellers represented they had a sound roof even though they had specific knowledge as to the actual condition of the roof and the Court found that they therefore were not on equal footing.

Although Cahoons made no specific representation in regard to the joists that Comer found to be highly inadequate, had the Metskers been apprised of the nature and extent of the damage and repairs, they would have had a better opportunity to discover any patent or latent defects. For instance, Comer found that the master bathroom was "over-spanned" because what used to be the kitchen area was now the master bathroom with a large Jacuzzi tub and extensive

---

[113] *Iota Management Corp. v. Boulevard Inv. Co.,* 731 S.W.2d 399, 413 (Mo. App. E.D)

[114] *Fox v. Ferguson,* 765 S.W.2d 689, 691 (Mo. App. E.D. 1989).

31

tilework which significantly added to the load. Metskers were never apprised of this and therefore could not get their inspector to focus on this.

Cahoons specifically represented that there were no problems with the main deck. There were clearly significant problems with it at the time of the sale. Again, had Cahoons made full disclosure, their inspector would have had a better opportunity to complete a full inspection of it. At a minimum, this is just one more issue that can only be resolved by a full trial on the merits.

## V. CONCLUSION

In conclusion, it is clear that the Cahoons made numerous representations and concealed significant adverse information about Property. Of course, the most significant and blatant misrepresentations/concealments were in regard to the nature and extent of the fire and resulting damage, and the nature and extent of the water issues which clearly pre-dated the purchase of Property by Metskers. They clearly are not relieved of any obligations based on the disclaimer and purported release which Graebel required be attached to the contract. The rider was designed to attempt to protect Graebel and nowhere is Cohoons' names mentioned or is the previous owner referred to

WHEREFORE, for the foregoing reasons, Plaintiffs pray that Cahoons' Motion for Summary Judgment be overruled, that this matter be allowed to proceed to trial, and for such further orders as the Court deem proper.

JOHN R. CAMPBELL, JR., LLC


By:    /s/ John R. Campbell, Jr.
          John R. Campbell, Jr. KS #19548
          One Hallbrook Place
          11150 Overbrook Road, Suite 350
          Leawood, Kansas 66211-2298
          (913) 661-9600
          (913) 661-9614 - Facsimile
          john@johnrcampbelljr.com

          ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned counsel of record hereby certifies that a copy of Plaintiff's Suggestions in Opposition to Defendant Daniel and Nicole Cahoon's Motion for Summary Judgment was served via the Court's electronic filing system and emailed to the following counsel for Defendants herein on this 28th day of April, 2016:

          Joseph S. Gall
          Humphrey, Farrington & McClain
          221 West Lexington, Suite 400
          P.O. Box 900
          Independence, Missouri 64051

          John A. Watt MO
          Baker Sterchi Cowden & Rice LLC
          2400 Pershing Road, Suite 500
          Kansas City, MO 64108-2533


          JOHN R. CAMPBELL, JR., LLC


By:    /s/ John R. Campbell, Jr.