**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

M. SCOTT METSKER, et al.,           )
           Plaintiffs,           )
                      )
    v.           )
                      )  No. 15-0286-CV-W-FJG
DANIEL R. CAHOON, et al.,           )
           Defendants.           )

**ORDER**

Pending before the Court are (1) Defendant Graebel Relocation Services Worldwide, Inc.'s Motion for Summary Judgment (Doc. No. 54); and (2) Defendants Daniel and Nicole Cahoon's Motion for Summary Judgment (Doc. No. 52). The Court notes that the defendants' requests for oral argument have been withdrawn (Doc. Nos. 76 and 77).

**I.     Background**

Plaintiffs filed the pending action on March 10, 2015, in the Circuit Court of Jackson County at Independence. On April 17, 2015, defendants timely removed the action, asserting diversity jurisdiction. Plaintiffs are homeowners of a single family home located at 8821 Boten, Lee's Summit, Missouri, legally described as: Lot 16, LOCHKIRK ESTATES, a subdivision in Jackson County, Missouri (the "Property"). Defendants Daniel and Nichole Cahoon presently reside in Salt Lake City, Utah, but formerly owned the Property at issue in this dispute. Defendant Graebel Relocation Services Worldwide, Inc., is a relocation services company, and the Cahoons conveyed the property to Graebel prior to the sale of the Property to plaintiffs. Plaintiffs generally allege that defendants' real estate disclosures minimized or omitted known conditions regarding the property, improperly inducing plaintiffs to purchase the property.

Plaintiffs' petition contains three counts:     Count I – Fraud and Misrepresentation

against the Cahoons; Count II – Negligent Misrepresentation against the Cahoons; and Count III – Negligent Misrepresentation against Graebel.

In its motion for summary judgment, Defendant Graebel argues that it has established its affirmative defenses of waiver, release, and estoppel. <u>See</u> Doc. No. 54. In their motion for summary judgment, the Cahoons argue that (1) plaintiffs released all their claims against them; (2) plaintiffs' detrimental reliance argument is negated by the fact that plaintiffs had an inspection of the home done prior to purchase; and (3) plaintiffs are unable to prove the required elements of negligent and fraudulent misrepresentation under Missouri law.   <u>See</u> Doc. No. 52.

## II.   Facts

This lawsuit arises out of the purchase of a home by the Plaintiffs, located at 8821 Boten, Lee's Summit, MO 64064 (the "Metsker home"). The Plaintiffs allege that certain material defects in the home were misrepresented by the Sellers, Defendants Daniel and Nicole Cahoon, in the "Sellers Disclosure and Condition of Property Addendum." At all relevant times, Daniel Cahoon was an employee of H&R Block.  Defendant Graebel Relocation Services Worldwide, Inc. ("Graebel") handles the relocation benefit provided to H&R Block employees.   The Cahoons deeded their Boten residence to Graebel, who then deeded it to plaintiffs after closing.

Defendant Daniel Cahoon completed and both Cahoon defendants signed the Disclosure attached as Exhibit B to Doc. No. 53. They also completed a "Graebel Relocation Services Worldwide, Inc. Homeowners Disclosure Statement."   Doc. No. 53, Ex. C. Defendant Daniel Cahoon testified he never met plaintiff Scott Metsker until after the filing of this suit, and Mr. Cahoon further testified that the plaintiffs never asked him any questions about the fire which occurred in the house.   Defendant Cahoon testified

that had the plaintiffs contacted him, he would have answered any of their questions.[1]

Graebel is a relocation services company, which entered into a Rider to Buyer Offer ("Rider") with Plaintiffs dated June 18, 2013, consisting of the Rider itself (attached as Exhibit 1 to Doc. No. 55),[2] and three exhibits titled Exhibit A to Rider to Buyer Offer (Exhibit 2 to Doc. No. 55),[3] Exhibit B to Rider to Buyer Offer (Exhibit 3 to Doc. No. 55), and Exhibit C to Rider to Buyer Offer — Graebel Relocation Services Worldwide, Inc. Release of All Claims by Buyer (Exhibit 4 to Doc. No. 55).

On or about June 19, 2013, Plaintiff Scott Metsker signed and initialed Exhibit 1, and initialed every page of Exhibits 2 and 3. Plaintiff Scott Metsker initialed every page of Exhibit 4, and on August 2, 2013, signed Exhibit 4 before Notary Public Sheila D. Havard. Plaintiffs do not dispute the authenticity of Mr. Metsker's signature and initials on these documents.

As a relocation company, GRSW purchases properties solely for the purpose of resale, and does not reside in the homes it sells. Neither GRSW nor its agents,

---

[1] Both plaintiffs and the Cahoon defendants were represented by agents in this transaction, so it is unclear how plaintiffs would have contacted the Cahoon defendants directly.

[2] The Rider (Exhibit 1) states:

> 1. Agreement to Terms of Rider. Graebel and Buyer hereby agree to amend the Buyer Offer in the manner set forth in this Rider. The terms and conditions contained in this Rider are in addition, take precedence over, and replace and supersede any contrary provisions of the Buyer Offer.

> 2. Exhibits. Exhibits A, B, and C are attached hereto and Incorporated herein by reference.

3 Exhibit A to Rider to Buyer Offer allows the buyer to waive certain inspections in purchasing the Home. See Exhibit 2. Plaintiffs did not waive any of the inspections, and Scott Metsker acknowledged that he had received tests, inspections, and disclosure documents. Exhibit A to the Rider states closing shall occur on August 2, 2013. Id. Scott Metsker had fifteen days to inspect the home. Doc. No. 65, Ex. E.

employees, or other representatives has ever resided in the Metsker home. <u>See</u> Doc. No. 55, Exhibit 3, at ¶¶ 3, 10.

Exhibit B to the Rider (Ex. 3 to Doc. No. 55) includes the following statements:

> 3.    Relocation Transaction Acknowledgement. Buyer expressly acknowledges all of the following:
>
>> a.    Graebel is a relocation services provider, which purchased the Property solely for the purpose of resale;
>>
>> b.    Graebel is not a natural person and therefore it has never resided in the Property;
>>
>> c.    None of Graebel's agents, employees, or other representatives have ever resided in the property; and
>>
>> d.    Graebel has no actual knowledge of the condition of the Property except those matters, if any, which arose after the date of acquisition of the Property by Graebel.
>
> 4.    <u>General Disclaimer of Representations and Warranties.</u> BUYER HEREBY ACKNOWLEDGES AND AGREES THAT GRAEBEL HAS-NOT MADE AND HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, OR CONCERNING:
>
>> a.    THE NATURE, SQUARE FOOTAGE, CONDITION, VALUE, OR QUALITY OF THE PROPERTY, INCLUDING BUT NOT LIMITED TO, THE WATER, THE SOIL, AND GEOLOGY AND THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY ELECT TO CONDUCT THEREON;
>>
>> b.    THE MANNER, CONSTRUCTION, CONDITION, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF ANY OF THE PROPERTY;
>>
>> c.    EXCEPT FOR ANY WARRANTIES CONTAINED IN THE DEED, IF ANY, THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY LEASE; POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION OR OTHERWISE; AND
>>
>> d.    THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY.

4

5. <u>No Express of Implied Representations or Warranties</u>. BUYER EXPRESSLY ACKNOWLEDGES AND AGREES THAT, IN CONSIDERATION OF THE AGREEMENTS OF GRAEBEL HEREIN, GRAEBEL MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE EXCEPT AS OTHERWISE SPECIFIED HEREIN RELATING TO THE PROPERTY.

6. <u>No Warranty of Compliance with Laws</u>. BUYER ACKNOWLEDGES AND AGREES THAT GRAEBEL HAS NOT WARRANTED, AND DOES NOT HEREBY WARRANT, THAT THE PROPERTY OR ANY IMPROVEMENTS LOCATED THEREON NOW OR IN THE FUTURE WILL MEET OR COMPLY WITH THE REQUIREMENTS OF ANY SAFETY CODE OR REGULATION OF THE STATE, COUNTY, OR MUNICIPALITY WHERE THE PROPERTY IS LOCATED, OR ANY OTHER AUTHORITY OR JURISDICTION.

\*\*\*

8. <u>Buyer's Inspection and Reliance Thereon</u>. BUYER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT BUYER HAS THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE PURCHASE OF THE PROPERTY. BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE PROPERTY BY BUYER AND THAT BUYER IS PURCHASING THE PROPERTY, ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS AND NOT ON ANY INFORMATION PROVIDED, OR TO BE PROVIDED BY GRAEBEL.

\*\*\*

10. Purchase from Relocation Company. BUYER ACKNOWLEDGES AND AGREES THAT GRAEBEL HAS OWNED THE PROPERTY ONLY SINCE THE DATE OF ACQUISITION OF THE PROPERTY BY GRAEBEL, HAS NOT RESIDED ON THE PROPERTY, AND IS NOT IN A POSITION TO MAKE ANY REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, AS TO THE PROPERTY OR THE CONDITION THEREOF.

11. <u>Graebel Not Bound by Statements or Other Information Provided by Others</u>. GRAEBEL IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, OR REPRESENTATIONS OF INFORMATION, PERTAINING TO THE

PROPERTY FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, OR ANY OTHER PERSON.

\*\*\*

13.     Tests. Inspections, and Disclosure Documents.

    a.    Tests and Inspections. The tests and inspections described in Exhibit A have been conducted in, on or with respect to the Property. Buyer acknowledges receipt of the test(s) and/or inspection(s) documentation specified in Exhibit A. In the event Graebel test(s) and/or inspection(s) documentation is not available at the time of the execution of the Buyer Offer and this Rider, Graebel agrees to provide Buyer with such reports within five (5) days of Graebel's receipt of such reports, and to provide Buyer five (5) days to review the reports and provide Graebel with written notice of defects in the manner described in Section 15 of this Rider.

    b.    Disclosure Documents. BUYER ACKNOWLEDGES RECEIPT OF THE DISCLOSURE DOCUMENTATION SPECIFIED IN EXHIBIT A. BUYER ACKNOWLEDGES AND AGREES THAT THE ABOVE-LISTED DISCLOSURE DOCUMENTATION IS BEING PROVIDED TO BUYER FOR INFORMATIONAL PURPOSES ONLY AND IN COMPLIANCE WITH GRAEBEL'S LEGAL DISCLOSURE DUTY, IF ANY, AND FOR NO OTHER PURPOSE. GRAEBEL MAKES NO REPRESENTATIONS, WARRANTIES, OR GUARANTEES RELATING TO THE PROPERTY BASED ON THE ABOVE-LISTED DISCLOSURE DOCUMENTATION. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT IT IS NOT ENTITLED TO RELY ON THE ABOVE-LISTED DISCLOSURE DOCUMENTATION AND THAT BUYER IS MAKING ITS PURCHASE DECISION BASED SOLELY ON THE BUYER'S OWN EXAMINATIONS, INSPECTIONS, AND TESTS OF THE PROPERTY.

\*\*\*

15.     Buyer's Inspection and Tests. Buyer has the right to inspect or to have the Property inspected and tested by others on Buyer's behalf to determine the existence of defects, if any. All inspections and tests shall be conducted at Buyer's sole cost and expense. Graebel recommends, but does not require, that Buyer secure such surveys, title inspections, professional building inspection reports, and other inspections and tests as Buyer, in its sole and exclusive discretion, deems necessary or appropriate to determine the condition of the Property, including but not limited to, any inspections or tests necessary to determine the presence of radon gas, asbestos, lead based paint, underground storage tanks, or toxic or hazardous

6

substances in or about the Property. Buyer acknowledges and agrees that all inspections and tests conducted on Buyer's behalf, and any defects discovered as a result of those inspections or tests, must be reported to Graebel or Graebel's agent in writing, accompanied by a complete copy of Buyer's inspection and test reports, no later than 5:00 p.m. (in the jurisdiction where the Property is located) on the last day of the Buyer's Inspection Period as set forth on Exhibit A. Buyer further acknowledges and agrees that, to the fullest extent permitted by law, buyer's failure to provide Graebel with a copy of the inspection and test reports and reported defects on or prior to the last day of the Buyer's Inspection Period shall constitute (a) Buyer's constructive acceptance of the condition of the Property, (b) Buyer's waiver of all inspection contingencies under the Buyer Offer of this Rider, and (c) Buyer's agreement to proceed to closing of the transaction for the sale and purchase of the Property as contemplated by the Buyer Offer and this Rider (the "Closing").

\*\*\*

17.     <u>Pre-Closing Inspection of Condition of Property</u>. Buyer shall have the right to make a final inspection of the Property within forty-eight (48) hours before Closing, not as a contingency of the sale, but solely to confirm that the Property's condition has not deteriorated from the date of the Buyer Offer and the Rider (ordinary wear and tear excepted).

\*\*\*

20.     <u>Buyer's Release</u>. Buyer expressly acknowledges that all of the obligations of Graebel pursuant to the Buyer Offer, as amended by this Rider, are subject to and conditional upon Buyer executing and delivering to Graebel at the Closing the Release of All Claims by Buyer which is attached hereto as Exhibit C and incorporated herein by reference.

\*\*\*

27.     <u>Miscellaneous Provisions</u>.

        a.     <u>Binding Effect/Entire Agreement</u>. The Buyer Offer of this Rider shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors, executors, legal representatives, administrators, and permitted assigns. All prior understandings and agreements between the parties are merged in the Buyer Offer and this Rider, which constitutes the entire agreement between the parties. The Buyer Offer and this Rider are entered into after full investigation made by Buyer, and neither party relies upon any statement or representation made by anyone unless contained herein. No provision of the Buyer Offer or this Rider

may be modified or waived unless in writing and signed by the party against whom the enforcement of such modification or waiver is sought.

Scott Metsker retained Crown Inspection to inspect the home, and the company did the inspection on June 24, 2013, after Exhibit B had been signed. Daniel Cahoon testified that Crown Inspection did not ask him any questions about the Missouri Disclosure, and if Crown Inspection had asked him questions, he would have answered. The report provided by Crown Inspections to the Plaintiffs notified them that "portions of the wood deck are in contact with the earth. This can be source of rapid deterioration and/or help to promote pest infestation. Part of the wood deck ledger board nailed to house. We recommend installation of lag screws to positively anchor the deck to the house framing." Report, Doc. No. 53, Ex. F, p. 3. The report further advised that the fireplace was full of insulation at the time of inspection and was not inspected. Id. p. 4. The report further advised plaintiffs "Drainage on the north side of the house should be improved to prevent erosion and pooling water." Id. p. 9. Regarding the joists, Crown Inspection noted that "The ceiling structure consist of standard wood joists" and noted no defects. Id. p. 14.

Exhibit C to the Rider (Exhibit 4 to Doc. No. 55) begins as follows:

> GRAEBEL RELOCATION SERVICES WORLDWIDE, INC.
> RELEASE OF ALL CLAIMS BY BUYER
> CAUTION: READ BEFORE SIGNING.

Immediately thereafter, at the top and center of the document, in all capital letters, bold type, Exhibit C to the Rider states:

> THIS DOCUMENT SHOULD BE INITIALED BY THE BUYER(S) WHEN THE RIDER TO BUYER OFFER IS SIGNED
>
> THIS DOCUMENT SHOULD NOT BE SIGNED BY THE BUYER(S) WHEN THE RIDER TO BUYER OFFER IS SIGNED

8

THIS DOCUMENT IS TO BE COMPLETED AND SIGNED BY
THE BUYER(S) AT THE CLOSING.

Exhibit C to the Rider contains the following language releasing Graebel from any

and all claims:

> Buyer, for itself and on behalf of Buyer's heirs, agents, representatives, successors, and permitted assigns (collectively, the "Releasing Parties"), FULLY AND FINALLY WAIVES AND RELEASES ANY AND ALL CLAIMS AND CAUSES OF ACTION (known and unknown, foreseen or unforeseen, developed or undeveloped) which Buyer may now have or may hereafter acquire against Graebel and Graebel's principal (i.e., the employer of Graebel's immediate predecessor in title to the Property (the "Former Owner")), and all of their respective predecessors, successors, parents, subsidiaries, and other affiliates, and all those entities' shareholders, directors, officers, employees, and agents (collectively, the "Released Parties") that arise from, or relate in any way to, or result in any manner from:

> 1. The Property;
> 2. The transactions contemplated by the Buyer Offer and this Rider;
> 3. All of the disclosures which were made to Graebel by the Former Owner of the Property; and
> 4. The presence of radon gas, asbestos, or any other toxic, hazardous, or other environmentally dangerous substance in, on, or about the Property;

> including, without limitation, all such claims and causes of action of any sort or type whatsoever, including claims based on any contract, tort, common law or other law, claims based on any federal, state, or local statute, rule, or ordinance, and any claims for punitive or other enhanced damages and whether any such claim or cause of action is made by Buyer or by any person which Buyer allows to reside in or about the Property or to come in contact with the Property.

> The Releasing Parties state and acknowledge that they are not entering into this Release in reliance upon any representations, promises, or assurances other than those expressly stated in the Buyer Offer, the Rider, and this Release. The Releasing Parties agree that there shall be no presumption against the drafter of this Release and that this Release shall be governed by and interpreted according to the laws of the state where the Property is located.

9

Exhibit C to the Rider also contains the following covenant prohibiting the buyer from asserting claims against GRSW:

> The Releasing Parties hereby irrevocably covenant to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting, or causing to be commenced, any proceeding of any kind against any Released Party based upon any matter purported to be released hereby.

Plaintiff Scott Metsker signed Exhibit C to the rider at closing. Plaintiff Scott Metsker testified he understood what the Release of All Claims by Buyer in the rider meant.

Six months after plaintiffs closed on the subject property, Plaintiff Victoria Metsker purchased another home, in January or February of 2014, because plaintiffs felt the home they purchased on Boten was unsafe due to issues with the joists, mold, water intrusion, and deck. At the time plaintiffs determined the Boten residence was unsafe and Mrs. Metsker purchased another home, no professional engineer had told plaintiffs the home was unsafe.

The Alleged Defects

The Fire

In November 2008, a house fire occurred at the Boten house. Daniel Cahoon testified the fire started in an electrical outlet in the bedroom of his daughter. The fire was confined to the room where it originated (Fire Report, Incident Number 08-0000349, attached to Doc. No. 53 as Exhibit G, page 5). Daniel Cahoon testified the fire caused no structural damage to the house. Daniel Cahoon and Mike Pottinger (the contractor who repaired the home after the fire) testified the water damage from the fire was primarily confined to the room where the fire occurred and the hallway outside of that bedroom. Daniel Cahoon further testified there was not extensive water damage throughout the

house. The Cahoons relocated to a house at Lake Lotawana for ten months while the fire restoration was being completed.

The Cahoon Defendants disclosed the fire on the Missouri Disclosure under paragraph 8, where they checked "Yes" to the question "are you aware of any additions, structural changes, or other material alterations to the Property?" (Exhibit B, Missouri Disclosure, at page 3, paragraph 8(a)). Defendants further disclosed on the Missouri Disclosure that there had been a "small electrical fire in exterior wall, contained with no structural damage" (Exhibit B, Missouri Disclosure at page 3, paragraph 8(a)). Defendants further disclosed the fact that there had been an insurance claim made relating to the fire (Exhibit B, Missouri Disclosure at page 6, paragraph 15(q); Nicole Cahoon Deposition, February 15, 2016, attached hereto as Exhibit I, at 76:10-77:12). Defendants disclosed the occurrence of the 2008 fire on the Graebel Disclosure at paragraph 9(g), by stating "Small electrical fire in 2008. No structural damage. Smoke and Water." (Exhibit C, Graebel Disclosure at GRSW000083; Exhibit A, Daniel Cahoon Deposition, at 109:17-110:8). Defendants additionally disclosed that the fire occurred at paragraph 9(V)(7) of the Graebel Disclosure when they checked "yes" to "Fire damage at any time?" (Exhibit C, Graebel Disclosure at GRSW000084; Exhibit A, Daniel Cahoon Deposition, at 111:3-8). Defendants additionally disclosed the fire at paragraph 4(D) of the Graebel Disclosure when they checked "yes" to "Has the roof…been damaged by fire…or other events?" and commented "portion of roof replaced during 2009 renovation after house fire." (Exhibit C, Graebel Disclosure at GRSW000078). However, plaintiffs argue that defendants did not disclose the magnitude and significance of that insurance claim, which in full came to over $200,000 for repairs to the house and $90,000 for contents.

Daniel Cahoon testified that neither Plaintiffs nor their agent ever asked him for more information regarding the fire than what was disclosed in the Graebel Disclosure; however, plaintiffs indicate that their real estate agent, Cathy Counti, specifically asked the sellers' agent, Chris Hall, for additional information. After closing on the home and moving in Plaintiffs obtained a copy of the fire report and asked neighbors about the fire. When asked what rooms in the home are still damaged from the fire, Plaintiff Scott Metsker testified that the damage is currently unknown, but that he has the feeling that there may be some damage in the house that he cannot see yet (Scott Metsker Depo., 128:16-25). Plaintiffs are worried that when they attempt to sell the house, having to disclose the fire to potential buyers may make the house unappealing, although they have not had a professional appraiser confirm this fear (Scott Metsker Depo., 129:1-13).

Christine Hall, the agent hired by Graebel to sell the home, completed a "Broker's Market Analysis and Strategy Report" (BMA) and submitted it to Cheri Woodard ("Woodard"), the relocation specialist for Graebel handling the transaction. Hall indicates on the BMA as follows: "THE HOUSE HAD AN ELECTRIAL [sic] FIRE SEVERAL YEARS BACK, IN AN OUTSIDE WALL. IT WAS QUICKLY CONTAINED SO THERE WAS NO STRUCUAL [sic] DAMAGE. THERE WAS EXTENSIVE SMOKE DAMAGE WHICH IS WHY THE WHOLE HOUSE WAS TORN OUT AND REBUILT." Plaintiff's Ex. F, p. 1. The BMA also asks the agent "What are the three-five challenges to getting this property sold?" Hall indicates in relevant part: "4. DISCLOSING PREVIOUS FIRE." Id., p. 6. Woodward did not request any documentation regarding the work done due to the fire, nor did she ask Hall what the cost of the repairs were as a result of the fire. Woodward was not aware that there was a fire report from the fire department or that the fire department was even involved in putting out the fire. Woodard testified that there was

nothing in either of the disclosure forms that indicates that the whole house was torn out and rebuilt.

Christine Hall, Graebel's real estate agent, testified that if she was aware of a material defect, she "absolutely would have to make sure they [sellers] put it on the seller's disclosure." Hall depo., 35:15-22. Hall further testified that "fire" is one of the two most inflammatory words, which would "put you in Defcon5." Id. 42:12-20. Hall testified that there is a "potential future stigma that a property will always carry if there's . . . a fire in it." Id., 137:5-8. Hall, however, testified that the Cahoon's disclosure did not require further explanation because, "I don't care as a buyer's agent because I am not necessarily going to believe anything the seller tells me anyway." Id., 45:13-19. Hall could not remember if she asked the Cahoons how much it cost to restore the house as a result of the 2008 fire. Hall testified that, "If I think they've overdisclosed or underdisclosed or if they're incorrect, I can tell them that in my opinion, that does not seem to really cover the details the way it should." Hall depo., 196:6-10.[4] Hall acknowledged that she was aware of the fact that the house sustained extensive smoke damage which is why the house had to be torn out and rebuilt. Hall testified that she cannot imagine that she did not have discussions with Woodard about the fire given the information contained in the BMA.

Cathy Counti, the real estate agent for the plaintiffs, testified she was told by Hall that there was a small fire in a bedroom and that the Cahoons loved the house so much they decided to upgrade other areas of the house.[5] Counti testified that she did not ask

---

[4] Plaintiffs cite to Hall's testimony about her beliefs as to realtors' duties under the law. The Court agrees with Cahoon Defendants that such testimony amounts to a legal conclusion, not a statement of fact, and does not consider those beliefs or opinions.

[5] Plaintiffs cite in their statement of facts to Counti's testimony about her opinions as to what buyers have a right to know, whether defendants' agents violated ethical obligations, and realtors' duties under the law. The Court agrees with the Cahoon

for a scope of work because Hall represented that the fire was small and not a big deal. Counti was told by Hall that the fire was small and "it was put out quickly' which is the information she transmitted to the Metskers. When Counti first saw the BMA, she "gasped" because she then knew at that time that both Hall and Graebel knew about the magnitude of the fire and "chose to either not tell us or to minimize it." Counti depo., 54:18 – 55:1; 56:10-14; 90:21-91:15.  Counti testified she relies on the disclosures to be true and on the agent to verify from her knowledge that the information is true.  Counti depo., 163:17-20.

Defendant Daniel Cahoon testified that nobody from Graebel ever asked any questions about the fire, requested any documentation regarding the fire, or asked for any information regarding the fire claim. Cahoon depo., 40:12-25. Daniel Cahoon testified he told Hall all about the fire, including their needing to redo everything.  Id. 128:9-20.

Mike Pottinger (hereafter referred to as "Pottinger") is the contractor the Cahoons hired following the 2008 fire. He identified the scope of work and estimate prepared by Cahoons' insurance company to repair the damage that resulted from the 2008 fire reflecting a cost to repair the damage of $208,339.13. Pottinger had to replace some charred studs. According to Pottinger, everything permeable had to be removed from the house including carpeting, sheetrock, wood, doors, door frames, cabinetry, and insulation; and then he had to place Kilz on everything to encapsulate the smell and then put the house back together, in order to make it habitable. Pottinger had to tear out and replace an acoustic ceiling. Pottinger testified that all of the drywall on the first and second floors had to be replaced and was replaced by his company. The insurance company paid for, and Pottinger replaced four exterior doors.  According to Pottinger, when he walked through the house after the fire, "you just got knocked over by the smell of smoke." "And

Defendants that such testimony amounts to legal conclusions and/or undisclosed expert opinion, and the Court will not consider those beliefs or opinions in its analysis.

then we gutted the house down to the studs so what's left is the exterior siding of the house and the studs." Pottinger depo., 109:19-110:2; 117:7-14.

Permits

On the Missouri Disclosure when asked if all necessary permits were obtained, Defendants checked the box "Yes." (Doc. No. 53, Exhibit B, Missouri Disclosure, page 3, paragraph 8(b)). According to the Pottinger, there were no structural changes involved in the renovation done to the home, and therefore the renovation did not require a permit. (Pottinger depo., 120:8-17). Making changes to the electricity would require a permit (Id., 120:17-21). Defendant Daniel Cahoon testified he pulled a permit for the electrical repair and upgrade in the house after the fire occurred (Daniel Cahoon Depo., 42:3-25). An inspector from Jackson County came to the residence after the permit was obtained to inspect the electrical repairs and upgrade (Affidavit of Daniel Cahoon, attached as Exhibit K to Doc. No. 53). Since an electrical permit was obtained, and an inspection completed by the county on the electrical repairs and upgrade, Defendant Daniel Cahoon believed that his statement on the Missouri Disclosure that all necessary permits were obtained was correct (Exhibit K, Affidavit of Daniel Cahoon).

Water Issues and Mold

When they purchased the home, the Plaintiffs were aware that the basement had evidence of water penetration (Scott Metsker Depo., 65:17-20; Victoria Metsker Depo., 42:25-43:8). Defendants noted on the Missouri Disclosure that there was no water leakage or dampness in the house, crawl space, or basement as of the date the disclosure was signed (Exhibit B, Missouri Disclosure, at page 2, paragraph 2, 7(d)). Defendants noted at paragraph 9(B) of the Graebel Disclosure that there was not any standing water, drainage, or flooding problems on the property (Exhibit C, Graebel Disclosure, at GRSW000083). Defendant Daniel Cahoon testified he did not indicate on

the Graebel Disclosure that there were any issues with water intrusion because water intrusion was not an issue for the home at the time the disclosure was completed. (Daniel Cahoon Depo., 63:23-64:5). Real estate agent Hall has no memory of the Daniel Cahoon telling her there had been a single issue of water intrusion from the outside, because if he had, she would have insisted that he put it on the disclosure, and she acknowledged it was not on the disclosure.

After purchasing the house, Defendants experienced water pooling outside of the basement sliding door about six times in the first five years and on a few of those occasions, water got a few feet into the basement (Daniel Cahoon Depo., 48:13-25). To alleviate these conditions, Defendant Daniel Cahoon testified he daylighted downspouts into the yard and kept the gravel in the courtyard refreshed (Id., 53:16- 25). Additionally, to alleviate the water pooling Defendants worked to keep the gutters cleaned (Id., 54:10-20). According to Daniel Cahoon, those remedial actions alleviated the problem of water pooling outside the basement sliding glass door. (Id., 54:17-24). Besides one occasion in May, 2013, when a contractor working on the home accidentally disconnected the downspout off of the gutter, Defendants had no further issues with water intrusion between the time Defendants moved back into the house in 2009 after the fire renovation and the time Plaintiffs purchased the house (Daniel Cahoon Depo., 54:25-55:19; 94:24-95:8). Defendant Daniel Cahoon testified if water intrusion had required any additional repairs beyond those done by Defendants, Defendants would have made the necessary repairs to correct the water intrusion (Id., 125:3-7).

While there was water staining noted in an inspection report, Daniel Cahoon testified that was due to a broken valve on the water heater in the basement, which Defendants replaced prior to selling the house, solving the problem (Daniel Cahoon Depo., 125:8-126:12). Plaintiff Scott Metsker testified that he believed water was being

forced from underneath the concrete slab directly outside the basement door laterally into the basement (Metsker Depo., 281:16-282:3). However, the parties dispute whether the concrete slab was present when Plaintiffs purchased the home from the Cahoon Defendants, or whether Plaintiffs had the offending concrete slab installed after they purchased the home.

While the Plaintiffs were aware there had been water intrusion previously in the basement, Plaintiffs did not retain anyone to check for mold in the home prior to closing on the house. Defendants noted on the Graebel Disclosure that they had not had a mold problem or mold remediation, abatement, clean up, or removal at the property. The Cahoon Defendants testified they never had any problems with mold in the house. Plaintiffs did not see any mold when they walked through the house; instead Plaintiffs first saw mold in the house when removing carpet in the basement, and Plaintiffs do not believe that mold existed in the home at the time they moved in, because the carpet was installed after plaintiffs had moved in (Scott Metsker Depo., at 264:2-9). The only time Plaintiffs had mold tests conducted in the home was in November, 2014, and Plaintiffs do not believe that the mold in the home is at a harmful level (Scott Metsker Depo., 90:3-20). Plaintiffs believe that the mold has been remediated where it no longer reflects a health concern to anyone (Id., 93:18-94:2).

Plaintiff Scott Metsker testified he first noticed water intrusion problems a few days after they moved in; there was approximately a six foot wet area by the basement door. Plaintiff next noticed water in the basement the following week. Scott noticed water in the basement again the following week. Plaintiff Scott Metsker attempted to determine the source of the water at that time but was not successful. He next noticed water around the middle of September (2013) when he noticed that the bottoms of boxes and the carpet were wet. He next saw water in the basement in early November. Plaintiff Scott Metsker

has found mold in various areas throughout the lower level; he believes it existed at the time they moved in and he just did not notice it. Metsker depo., 80:15-81:19. He has removed drywall and trim from Property that he believed contained mold. Id.

Deck

Cahoon Defendants noted on the Missouri Disclosure that there were not any problems with the driveways, patios, decks, fences, or retaining walls on the property (Doc. No. 53, Exhibit B, Missouri Disclosure, page 2, paragraph 7(f)). The deck was installed in 2009 as part of the renovation the Defendants undertook following the fire. The Cahoon Defendants testified they never had any issues in regard to the back deck. The condition of the deck was completely observable on the date Plaintiffs' inspector inspected the property and before Plaintiffs purchased the house (Scott Metsker Depo., 96:11-22). There was nothing hidden or undisclosed from Plaintiffs about the deck, which was open and obvious (Id., 97:2-5). While Plaintiffs believe the deck to be dangerous, they have done nothing to fix it (Id., 98:22-99:1).

Movement

Defendants noted on the Missouri Disclosure that they had not had any movement, shifting, deterioration, or other problems with the walls, foundations, crawl space, or slab (Doc. No. 53, Exhibit B, Missouri Disclosure, page 2, paragraph 7(a)). Defendants noted on the Graebel Disclosure that they were unaware of any settling, expansive soils, or other soil problems (Sliding, earth movement, upheaval, or stability) on the property (Exhibit C, Graebel Disclosure at GRSW000083). Daniel Cahoon testified the Cahoon Defendants never had any problems with the foundation of the house, including cracking of the foundation (Daniel Cahoon Depo., 99:20-24).

Floor Joists

According to their contractor, when the Defendants made renovations to the home after the fire, the renovations structurally did not change anything that would have added weight or loads more than what the house was originally designed for (Mike Pottinger Depo., 94:16-95:12). When Plaintiffs had an inspection done on the home prior to purchasing the property, the inspection company found no problem with any visible joists supporting the floors (Scott Metsker Depo., 107:12-20). Plaintiffs discovered issues with floor joists in other areas of the basement after they removed drywall ceilings in 2015 (Id., 104:21-105:4). Plaintiff Scott Metsker admitted that any issues with the joists he first discovered after moving into the house were not visible at any time prior to his removal of the drywall ceiling (Id.,107:4-9; 109:4-11).

Fireplace/Chimney

The Cahoon Defendants noted on the Missouri Disclosure that they had not had any problems with the fireplace and/or chimney, and that the date of the last cleaning was unknown to them (Doc. No. 53, Exhibit B, Missouri Disclosure, page 2, paragraph 7(g)). There are two fireplaces in the home, one on the lower level, and one on the main level (Daniel Cahoon Depo., 91:20-23). Cahoon defendants testified they never used the fireplace on the lower level, and they insulated it because the basement was cold (Id.,92:2-6; 92:21-93:3). The Plaintiffs did not ask a professional to inspect the chimney, but rather inspected it themselves, and found that it appeared to be improperly repaired (Scott Metsker Depo., 125:9-22). Plaintiffs have no confirmation that the chimney was improperly repaired short of their own visual observations (Id., 125:23-25). Plaintiffs purchased the home with the understanding that they had no idea about the condition of the fireplace (Id., 127:2-5).

Testimony of Frank Comer, P.E.

Frank Comer ("Comer") was hired by the Metskers and prepared a report based on two inspections of Property. Comer is a professional engineer which he acquired by college, internship and experience. Comer was provided both the U.S. Inspection report provided by Graebel and the Crown inspection report which Metskers had procured.

Comer believes that the holes in the joists due to their size and spacing present a structural hazard at Property. Comer detected many deflection and failure-related cracks in the joists that indicates a failure in the lumber. Comer testified that he advised the Metskers that there were excessive levels of mold spores. Comer does not believe the concrete slabs around the home are causing the water problems plaintiffs are experiencing; in fact, he believes that the concrete slabs are providing a ready transport of the water away from the house. However, Mr. Comer's report at page 5, page 3, says "the grade at the rear yard area results in water accumulation along the foundation walls." Comer believes that water is coming from under the home and not laterally because of hydrostatic pressure. Comer's opinion is that the drainage condition, which has existed for many years, has water accumulation adjacent to and beneath the home, and that seepage into the basement area has resulted in saturation of the basement area floor coverings.

## III.    Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–90 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586–90.

A nonmoving party must establish more than "the mere existence of a scintilla of evidence" in support of its position. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

> The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

<u>Torgerson v. City of Rochester</u>, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citations and quotations omitted).

## IV. Discussion

### A. Graebel's Motion for Summary Judgment (Doc. No. 54)

Plaintiffs have pled a claim against Graebel in Count III of the Petition, asserting negligent misrepresentation. Graebel indicates that the material facts in this case establish that (1) plaintiffs have waived all claims against it, (2) plaintiffs acknowledged they did not rely on representations made by Graebel, and (3) Graebel's affirmative defense of release has been established. Defendant Graebel, in particular, argues that in light of the extensive written acknowledgements and releases in this matter, defendant Graebel is entitled to judgment as a matter of law.

Defendant Graebel argues that the interpretation of the parties' release agreement is a question of law for the court to decide, and "[a]bsent fraud, accident, mistake, or duress, and unless the terms of the agreement are themselves ambiguous," a court will not "consider extrinsic evidence contradicting the terms of the agreement." <u>Guthrie v. Hidden Valley Golf & Ski, Inc.</u>, 407 S.W.3d 642, 647 (Mo. App. E.D. 2013). Defendant Graebel argues that the terms of the release in this matter are clear and unambiguous, and plaintiffs knew they were releasing certain rights when they signed the release. Defendant Graebel also argues that terms of the Rider to Buyer Offer, which indicates

that Graebel had no actual knowledge of the condition of the property given that it never resided there, preclude plaintiffs' claims against it. Additionally, defendant points out Section 11 of Exhibit B, which states "Graebel is not liable or bound in any manner by any verbal or written statements, or representations of information, pertaining to the property furnished by any real estate broker, agent, employee, or any other person." Thus, defendant Graebel argues that plaintiffs agreed that Graebel could NOT be held accountable for statements made by the Cahoons or the Cahoons' agents.

In response, plaintiffs note that Graebel (unlike plaintiffs) had full knowledge of the nature and extent of the November 2008 fire, because the BMA submitted by Hall to Woodard indicated that the whole house had to be torn out and rebuilt. Furthermore, Woodard was provided copies of the Cahoons disclosure forms, which plaintiffs argue minimized the nature and extent of the fire and do not indicate that the whole house had to be torn out and rebuilt. Woodard testified that her manager said to "Disclose" the fire after she showed him a copy of the BMA; however, the parties dispute whether his admonition to "Disclose" applied to the Cahoons only, or to Graebel as well. Although the Rider indicated that Graebel had no knowledge of the property prior to when it owned it, plaintiffs argue that this statement is not true given the BMA. Plaintiffs argue that the disclosures indicated the fire was a "small electrical fire in exterior wall contained w/no structural damage." Additionally, when the Metskers' real estate agent, Counti, inquired about the fire, Hall said there was a small fire in a bedroom and that the Cahoons loved the house so much they decided to upgrade other areas of the house.

Plaintiffs cite to White v. Bowman, 304 S.W.3d 141 (Mo. App. S.D. 2009), in which the Court stated: "[The seller's] duty to speak arose from its superior knowledge prior to the execution of this contract. The presence of a clause disclaiming warranties in a contract does not negate a pre-contractual duty to speak." White, 304 S.W.3d at 147

(citing Artilla Cover Resort, Inv. v. Hartley,72 S.W.3d 291, 299 (Mo. App. S.D. 2002)). Furthermore, "Missouri law…holds that a party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract." Lollar v. A.O. Smith Harvestore Prods., Inc., 795 S.W.2d 441, 448 (Mo. App. W.D. (1990))(J. Gaitan).

Plaintiffs state that, reviewing the facts in the light most favorable to them, defendant Graebel knew or should have known that the entire house had to be gutted after sustaining extensive smoke and water damage, and failed to make sure that information was disclosed to potential buyers.  "A duty to disclose information exists  . . . where one party has superior knowledge which is not within the fair and reasonable reach of the other party." Ringstreet Northcrest, Inc. v. Bisanz, 890 S.W.2d 713, 720 (Mo. Ct. App. 1995) (citing Blaine v. J.E. Jones Constr. Co., 841 S.W.2d 703, 705 (Mo.App.1992).   Here, there are at least questions of material fact as to whether defendant Graebel possessed information that was not within the fair and reasonable reach of plaintiffs, as even though a fire report existed, based on the disclosures and the representations made by Graebel's agent, plaintiffs believed there was no need to look for such a report.   Given that these questions remain, the Court will not enforce the release plaintiffs entered into in this instance.   Defendant Graebel's motion for summary judgment, therefore, is **DENIED.**

### B.    Defendants Daniel and Nicole Cahoon's Motion for Summary Judgment (Doc. No. 52)

The Cahoon defendants argue that summary judgment is proper for three reasons: (1) plaintiffs contractually released any claims arising from the sale of Defendants' residence, as they signed the "Release of All Claims by Buyer" Rider; (2) Plaintiffs were not entitled to rely on Defendants' disclosures because they conducted their own investigation of the property; and (3) Plaintiffs are unable to show that any

representations made by Defendants were false. The Claims against the Cahoon defendants are contained in Counts I and II. Count I alleges that the Cahoons fraudulently represented the history of the house including, but not limited to, the nature and extent of the fire that occurred in November of 2008. Plaintiffs assert that the Cahoons minimized the size of the fire, which required repairs costing well over $200,000 and required the interior of the house to be ripped out to the studs and completely replaced. Plaintiffs also assert that the Cahoon defendants represented in their disclosures they never experienced water issues, whereas defendant Daniel Cahoon admitted in deposition that they had experienced water intrusion in the past, with the last occasion being the month before Plaintiffs signed the contract to purchase the property. Count II sets forth a theory of negligent misrepresentation, based on the same theories regarding failure to disclose.

          1.    Contractual release

The Cahoon Defendants argue that they are covered under Graebel's "Rider" and "Release of all Claims" Cahoon Defendants note that the "Rider" purported to release all of Plaintiffs' claims sounding in tort, contract, or common law, not only against Graebel, but also against "Graebel's principal (i.e. the employer of Graebel's immediate predecessor in title to the Property (the "Former Owner")), and all of their respective predecessors, successors, parents, subsidiaries, and other affiliates, and all those entities' shareholders, directors, officers, employees. . ." (Cahoon Defendants' Exhibit E) (emphasis added). Cahoon Defendants further argue that these documents demonstrate that Plaintiffs released all claims against these individuals and entities arising from "(1) The Property. . . [and] (3) All of the disclosures which were made to Graebel by the Former Owner of the Property. . ." Id. Because Daniel Cahoon was and remains a H&R Block employee and Plaintiffs' claims arise from his Disclosures to Graebel, Cahoon

defendants argue that all claims against them are released for the same reasons as stated in Graebel's motion for summary judgment.

As noted by plaintiffs in their response, however, this argument would not preclude claims against Nicole Cahoon, who signed the disclosures and is not an employee of H&R Block. Furthermore, as with Defendant Graebel, the Court finds that <u>White v. Bowman</u>, 304 S.W.3d 141 (Mo. App. S.D. 2009) applies in this matter. In White, the Court stated: "[The seller's] duty to speak arose from its superior knowledge prior to the execution of this contract. The presence of a clause disclaiming warranties in a contract does not negate a pre-contractual duty to speak." <u>White</u>, 304 S.W.3d at 147 (citing <u>Artilla Cover Resort, Inv. v. Hartley</u>,72 S.W.3d 291, 299 (Mo. App. S.D. 2002)). Furthermore, "Missouri law…holds that a party may not, by disclaimer or otherwise, contractually exclude liability for fraud in inducing that contract." <u>Lollar v. A.O. Smith Harvestore Prods., Inc.</u>, 795 S.W.2d 441, 448 (Mo. App. W.D. (1990))(J. Gaitan). Here, as noted by plaintiffs, questions of material fact remain as to whether the Cahoon Defendants made affirmative misrepresentations about the size of the fire, and/or concealed material facts about the amount of restoration that had to be done to the house and the presence of water and/or mold.

Accordingly, summary judgment is denied on this basis.

        2.      Plaintiffs' Inspection

Cahoon defendants next argue that plaintiffs' independent inspection of the property negates their reliance on the Cahoon defendants' disclosures. Generally, "where a party makes his own independent investigation, he will be presumed to have been guided by what he learned and the conclusions he reached and will not be permitted to say that he relied on misrepresentations of another and that he was deceived thereby." <u>Colgan v. Washington Realty Co.</u>, 879 S.W.2d 686, 690 (Mo. Ct. App. 1994), citing

Consumers Co-op. Ass'n v. McMahan, 393 S.W.2d 552, 556 (Mo.1965). There are three exceptions to this general rule: "First, if the party making the independent inspection makes only a partial inspection and relies on the misrepresentations as well as the inspection, he may maintain an action for fraud. Second, the buyer is entitled to rely on the representation when he lacks equal footing for learning the truth where the facts are peculiarly within the knowledge of the party making the representation and are difficult to ascertain. Third, even if the parties stand on equal footing, if the seller makes a distinct and specific representation, the buyer has the right to rely on the representation." Brennan v. Molina, 934 S.W.2d 631, 635 (Mo. App. E.D. 1996).

The Cahoon defendants state that none of these three exceptions apply in the present matter, as (1) plaintiffs made a full inspection; (2) plaintiffs did not lack the ability to discover any of the house issues allegedly hidden from them; and (3) plaintiffs have not shown a distinct and specific representation made by defendants that turned out to be false.

In response, plaintiffs argue that they lacked equal footing for learning the truth because of facts peculiarly within the knowledge of the party making the representation, as the Cahoon defendants knew they had a fire that resulted in more damage than what was disclosed, and knew they had water issues and specifically represented they had none. Plaintiffs argue that a thorough inspection could not have determined the magnitude of the previous fire, and unless it was raining it would be very difficult for an inspector to ascertain the water problems. Plaintiffs also argue that they meet the third exception set forth in Brennan, where the seller makes specific and distinct representations, such as here where the sellers indicated they had a small contained fire, and no other information was conveyed to inform the plaintiffs that the house had to be gutted to make the necessary repairs. Plaintiffs further note that, although no specific

representations were made about the joists found inadequate by Comer, Comer found that the remodel may have contributed to an increased load on the joists, noting that the master bathroom was "over-spanned" because what used to be the kitchen was now the master bath with a large Jacuzzi tub and extensive tilework. Plaintiffs argue that the extent of the remodel was unknown to them and their inspector, but was information peculiarly in the knowledge of the Cahoon defendants. See Fox v. Ferguson, 765 S.W.2d 689, 691 (Mo. App. E.D. 1989 (noting, "The hearer is entitled to rely on specific representations even if the parties have equal means of knowledge or the hearer conducts his own investigation but nevertheless does not stand on equal footing with the speaker and relies on the speaker's representations.").

The Court finds that questions of material fact remain as to whether plaintiffs were entitled to rely on the representations made by the Cahoon defendants due to (a) lack of equal footing for learning the truth or (b) distinct and specific representations made by the Cahoon defendants. Brennan v. Molina, 934 S.W.2d 631, 635 (Mo. App. E.D. 1996). Accordingly, Cahoon defendants' motion for summary judgment is denied on this basis.

### 3.    Elements of Fraud and Negligent Misrepresentation

Cahoon defendants argue that plaintiffs cannot meet the elements of fraud or negligent misrepresentation as to the specific representations alleged in the Petition. Count I in Plaintiffs' Petition is for "Fraud and Misrepresentation." (Plaintiffs' Petition, page 3). In Missouri, there are nine elements of fraud: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or his ignorance of the truth; (5) the speaker's intent that his statement be acted upon; (6) the hearer's ignorance of the falsity of the statement; (7) his reliance on the truth of the statement; (8) the hearer's right to rely on the statement; and (9) the hearer's consequent and proximate injuries. Blanke v. Hendrickson, 944 S.W.2d 943, 944 (Mo. Ct. App. 1997), citing Colgan v. Washington

<u>Realty Co.</u>, 879 S.W.2d 686, 689 (Mo.App.1994) "Failure by a plaintiff to establish any one of the foregoing elements of fraud precludes recovery." <u>Mobley v. Copeland</u>, 828 S.W.2d 717, 724 (Mo. Ct. App. 1992).

Count II in Plaintiffs' Petition is for "Negligent Misrepresentation." (Plaintiffs' Petition, page 6). In Missouri, the elements of negligent misrepresentation are: (1) that speaker supplied information in the course of his business or because of some other pecuniary interest; (2) that, due to speaker's failure to exercise reasonable care or competence in obtaining or communicating this information, the information was false; (3) that speaker intentionally provided the information for the guidance of a limited group of persons in a particular business transaction; (4) that listener justifiably relied on the information and (5) that as a result of listener's reliance on the statement, he/she suffered a pecuniary loss. <u>Colgan v. Washington Realty Co.</u>, 879 S.W.2d 686, 689 (Mo. Ct. App. 1994) (internal citations omitted) (emphasis added).

Cahoon defendants argue that, for either of the two claims pled against them, plaintiffs must prove that the defendants made false representations and knew that the representations were false or were ignorant of the truth. Defendants state that there is no evidence that they made any false representations as to any of the seven pled conditions of the house. The Court examines each alleged misrepresentation in turn.

### a. Fire and Resulting Damage

Defendants argue that they adequately disclosed the 2008 fire. While the fire itself was disclosed on the forms completed by defendants, the Court believes that questions of material fact remain as to the alleged misrepresentations as to the extent of the fire and the extent of renovation needed.

### b. Permits

Plaintiffs alleged in their Petition that they had been unable to locate permits

obtained by the Cahoon defendants to repair the fire damage. Plaintiff Scott Metsker testified at deposition that he was aware of the 2009 permit obtained by defendants for an electrical upgrade, however. This was the only permit that defendants obtained; therefore, defendants argue that neither a claim for fraud or negligent misrepresentation can survive. Plaintiffs do not respond directly to this issue. From the facts of this case, it appears that no fraud or misrepresentation occurred in relation to defendants' statements regarding the permits. Summary judgment is **GRANTED** as to these claims.

> c.      Water Leakage and/or Mold Issues

Defendants noted on both Disclosures that there were no issues with water leakage or dampness. Although there had been a few instances of water pooling, defendant Daniel Cahoon testified that he did not indicate that on the disclosures because it had been alleviated before selling the house. Defendants also testified they had not experienced any issues with mold. Defendants also argue that no harm can be shown regarding mold, as plaintiffs have testified that they remediated the mold conditions. The Court, however, finds that plaintiffs have pointed to sufficient factual material to show that questions of fact remain as to whether the Cahoon Defendants misrepresented the presence water leakage and/or mold. Furthermore, just because the plaintiffs may believe that they have remediated the mold condition does not mean that they may not be entitled to damages for the costs of remediating that condition. Defendants' motion for summary judgment is **DENIED** on this issue.

> d.      Back Deck

With respect to the back deck, defendants never had any problems with the back deck, which was installed in 2009 as part of the renovation after the fire. Furthermore, plaintiff Scott Metsker testified that the condition of the deck was completely observable at the time of the inspection prior to closing. Therefore, Cahoon Defendants argue these

claims fail for two reasons (1) defendants said nothing false; and (2) plaintiffs are not entitled to rely on the disclosures when they had every opportunity to, and did, inspect the deck. The Court finds that the inspection of the deck, which was in an open and obvious condition at the time of the initial inspection, eliminates plaintiffs' claim here. See Colgan v. Washington Realty Co., 879 S.W.2d 686, 690 (Mo. Ct. App. 1994). Defendants' motion for summary judgment is **GRANTED** as to issues with the back deck.

> e.  Basement Slab

Defendants argue they never had any problems with the foundation of the house or slab, including cracking of the foundation or slab, and defendants related the same on the disclosures.  Defendants state that plaintiffs are unable to present any evidence that the Cahoon Defendants were aware of movement in the basement slab.  Plaintiffs have not presented facts or argument to controvert defendants here; therefore, Cahoon Defendants' motion for summary judgment is **GRANTED** as to the basement slab.

> f.  Floor System or Joists

Defendants argue that the joists below the master bath area were visible to plaintiffs' inspector prior to purchase, and that no problems with the joists were noted. However, plaintiffs have pointed to facts regarding the complete gutting and refinishing the interior of the house that, had they been known to plaintiffs, might have led an inspector to look more closely at the joists underneath the master bath and which their expert now states are insufficient to support the weight of the master bath.  Defendants also argue that plaintiffs discovered alleged issues with other joists only after tearing down a drywall ceiling after purchase, and defendants argue that they could not have known what was beneath the drywall either.  The Court believes, however, that what defendants knew about what was beneath their drywall (which most likely was replaced following the fire) is an issue for a jury to determine.  Defendants' motion is denied as

related to floor system and/or joists.

g.    Chimney

Cahoon defendants argue that they had not had any problems with the chimney, and plaintiffs' only evidence that there are problems with the chimney is their own observations.   Plaintiff Scott Metsker testified that they have not asked a professional to inspect the chimney, but rather inspected it themselves. Plaintiffs do not set forth any facts or legal argument showing that there are trial-worthy disputes regarding the condition of the fireplace.   Therefore, Cahoon Defendants motion for summary judgment is **GRANTED** as it relates to the condition of the fireplace.

## V.    Conclusion

Accordingly, for all the reasons stated herein, (1) Defendant Graebel Relocation Services Worldwide, Inc.'s Motion for Summary Judgment (Doc. No. 54) is **DENIED**; and (2) Defendants Daniel and Nicole Cahoon's Motion for Summary Judgment (Doc. No. 52) is **GRANTED IN PART** as related to plaintiffs' claims regarding representations as to the permits, back deck, basement slab, and chimney; and is **DENIED IN PART** in all other relevant aspects.

**IT IS SO ORDERED.**

**/S/ FERNANDO J. GAITAN, JR.**
Fernando J. Gaitan, Jr.
United States District Judge

Dated:  _March 27, 2017_
Kansas City, Missouri

31